WILLIAM J. BROWN

*vs.*

ANDROSCOGGIN & KENNEBEC RAILROAD COMPANY.

MARY A. BROWN *vs.* SAME.

NORA M. BROWN *vs.* SAME.

ESTHER SLATTERY, PRO AMI *vs.* SAME.

Cumberland.      Opinion November 13, 1928.

388

*Richard E. Harvey, Eugene F. Martin,* for plaintiffs.
*William B. Skelton,* for defendant.

SITTING: WILSON, C. J., PHILBROOK, DUNN, BARNES, JJ., DEASY, J. concurring in the result.

BARNES, J. The case first entitled is an action brought by the driver of an automobile to recover damages suffered in a collision with an electric car which was being moved, in the carriage of freight, in the course of its business, by the defendant company.

With this case were tried three other cases wherein the passengers in the automobile which this plaintiff was driving are suing the same defendant to recover for injuries by them sustained. These passengers are the wife, daughter and granddaughter of the driver.

To secure brevity the opinion is written as of the first case. The same result is reached in each.

Neither the driver nor any other plaintiff is entitled to a verdict,

unless such plaintiff shall establish the fact of negligence in the operation of the defendant's car.

The testimony is undisputed that the granddaughter, at the time of the accident, was but five years old, and that her grandparents, one the driver, the other a passenger, were her guardians on the day of the accident.

Plaintiffs must severally prove that, in their individual capacities, and as guardians of the minor, they were free from contributory negligence.

At the conclusion of all the evidence the defendant moved that verdicts should be directed for the defendant.

Such verdicts were directed, each plaintiff took exceptions thereto, and the question for determination by this Court is whether or not the direction of such verdicts, or any of them, was proper, under the law.

The accident occurred in broad daylight, on a crossing of defendant's track, at grade, over a main highway, which each had a right to travel, and where their rights and duties are commensurable, save that the defendant is confined to its rigid road of steel.

The measure of care demanded of each is that degree of care that would be expended by an ordinarily prudent person, in the same or like circumstances.

Now what are the facts?

The driver testified that he was "hard of hearing," though he said in cross-examination, "I always hear in the car, my folks tell me, better than I can in the air."

The motorman approached the highway through a private dooryard and not along an intersecting street.

They must each, therefore, exert more care than if otherwise conditioned and situated; the driver to be alert through the sense of sight, to make up for any handicap because of less than normal acuteness of hearing, and the motorman to have his speed reduced and his car under that degree of control that is demanded when an electric car is to be propelled from roadside property to and over the surface of a public, and a much travelled street, in the afternoon of a bright day at the height of the summer traffic.

For about a quarter of a mile northerly from the crossing the highway is straight and unobstructed. At three hundred feet from

the crossing, and northerly was a sign, four feet, three inches above the ground, easily to be read from the highway, and inscribed, "Safety First. Railroad Crossing — 300 Feet."

Down this highway the driver guided his automobile, and after he had passed the sign, the track of defendant's railway, with its trolley wire overhead, ran along on his left. Each of the three adults observed the safety sign; at least two of them spoke of it. The automobile was driven on, it may be at reduced speed, and as its occupants approached the crossing a sign at the crossing became more and more plainly visible, as also the trolley-wire suspended over the highway. Yet they testified they could not see the crossing, could not tell from which side a car or train might be approaching, or whether it was the crossing of a steam or of a trolley road.

The three were positive that none heard the approaching car.

The automobile was not stopped before making its crossing, evidence of negligence had it been approaching a crossing of a steam railroad, but proceeded on the side of the highway at its driver's right; an automobile coming to its rear was pulled out to the left, passed it and went on, and as the driver of the wrecked car followed, he testified, "The first thing I knew this car bumped into me. * * * My car was across the track when the electric car hit me * * * I see the crossing when I got on to it, when I looked back to the right, after I got on the crossing."

Asked if his daughter warned him of the crossing ahead, he said, "She certainly did."

The driver's wife testified: "I noticed a sign and moreover. I heard my daughter say that the sign was a railroad crossing sign; she says, 'There is a railroad crossing ahead,' and so of course when we got to that place I was trying to see as much as I could from the back seat, and the first thing I knew was that we were all looking as we went ahead and one car was ahead of Mr. Brown; I don't know whether there was more or not but there was one car and I looked just like this (illustrating), you know, as anyone naturally will and the little girl was on this side of the window looking out, and I was paying my attention to the electric car.

Q. To what?

A. To the railroad crossing.

Q. Now as you drove along which way did you look?

A. Why, I happened to be looking like this (illustrating).

Q. Do you mean straight ahead?

A. Straight ahead, and of course when I looked like this I usually notice anything that is in the outside air.

Q. You knew that there was a crossing some distance ahead of you?

A. Yes, I heard Mary say so.

Q. You saw the sign yourself?

A. Yes, I saw the sign.

Q. Did Mr. Brown see the sign?

A. I don't know; he is always looking of course for railroad crossing signs but he didn't speak to me and I didn't speak to him but I knew it from Mary's saying so.

Q. Did you listen as you drove along there?

A. Yes, sir."

Considered under the rule demanding of them the exercise of ordinary care these plaintiffs were negligent, and to the very moment of impact. And the little child suffered because of the negligence of its guardians at the time of the accident. It is evident that none of the occupants of the automobile perceived that a car was approaching, or that if they were aware of the fact they failed to adjust their movements to the necessities of the situation.

Three disinterested witnesses were in positions where they may have heard signals by the motorman as he approached the crossing. One testified that he did not hear any; another that she heard the car approaching; that she couldn't say for sure the whistle sounded, but that she supposed it did, and the third that as he stood in his dooryard he heard the motorman's signals.

In the rear compartment of the car an express messenger rode, a man whose duty it was to aid when contact with the trolley wire was disturbed. There was no conductor. The express messenger testified that he heard the motorman's signals for the crossing and described the signals as the motorman described them.

The latter testified that while he was in the dooryard next the crossing he saw the automobile about 300 feet up the road; that a house or houses obstructed his view while moving in the dooryard; that he was running slowly, his power was shut off; he was just "drifting"; that when he arrived at a point about 50 feet from the

crossing he gave the car a little power; that when he came near the crossing he saw the automobile again, as he said "right on me." "I throwed my brake and stopped, and he came along and didn't even touch the coupler, down underneath the bumper." He testified that in the dooryard next the crossing his regular signal for the crossing was one long whistle followed by two short ones; and that just before the collision he "blew one long whistle and then I blew another short one, and when this car was coming I blew a long whistle, a great, big, long whistle."

The driver of the car was a witness for the plaintiffs, and his testimony as to speed and management was not contradicted.

A woman witness, standing on the sidewalk that the car must cross, accompanied by her two little girls, testified that it was coming to the sidewalk, "Very slow. Q. — Faster than a good walk? A. — No; slower if anything." And the messenger, who was in the rear of the car, said when asked as to the suddenness of the stop: "There was no jolt such as you feel when the car is placed in emergency, the same feeling you would have when the car came to an ordinary stop."

Where the car stopped, how far across the travelled part of the highway it had proceeded when it stopped, is of importance in considering any of the phases of these cases.

The roadway was macadam, with gravelled shoulders. Asked "How far into the road part had you got when your car came to a dead stop?" the motorman answered, "I should say I wasn't over two feet on the macadam." He said that when he stepped from the door at the left forward corner of the car down to the ground he stood on the gravel.

The express messenger observed that when he returned to a position exactly in front of the standing car, to catch the trolley rope, his toes were right on the edge of the macadam. The witness who testified to hearing the whistle and the crash of the collision, went at once to the automobile, and returning noted the position of the car. He testified that the trucks of the car had not entered on the macadam.

No witness attempts to give the exact distance the car moved beyond the gravelled shoulder of the road, but none of them suggest it reached the middle of the macadam.

The record shows no evidence of negligence on the part of the defendant. It shows clearly, in the testimony above cited, and in other sections not herein referred to, that the adult passengers were each engaged in some sort of search for the crossing all knew they were approaching. If their testimony is taken literally, it shows negligence on the part of each, negligence that contributed to the occurrence of the collision, and that continued to a point of time when nothing that the motorman could do could afford them impunity.

When the motion for a directed verdict was made, the Justice doubtless asked himself, on the evidence, can a verdict for any of these plaintiffs stand?

If the answer were in the negative, it became clearly his duty to direct verdicts for the defendant.

It is the opinion of the Court that the ruling of the Justice was correct.

*Exceptions overruled.*